# 20-4202(L)

## 21-56(CON)

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆◆

TREVOR MURRAY,

*Plaintiff-Appellee-Cross-Appellant,*

—against—

UBS SECURITIES, LLC, UBS AG,

*Defendants-Appellants-Cross-Appellees.*

―――――――

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## SUPPLEMENTAL BRIEF FOR PLAINTIFF-APPELLEE-CROSS-APPELLANT TREVOR MURRAY

ROBERT B. STULBERG
PATRICK J. WALSH
STULBERG & WALSH, LLP
14 Wall Street, Suite 5G
New York, New York 10005
(212) 268-1000

SCOTT A. KORENBAUM
SCOTT A. KORENBAUM, ESQ.
14 Wall Street, Suite 1603
New York, New York 10005
(212) 587-0018

ROBERT L. HERBST
BENJAMIN J. ASHMORE, SR.
HERBST LAW PLLC
420 Lexington Avenue, Suite 300
New York, New York 10170
(914) 450-8163

*Attorneys for Plaintiff-Appellee-Cross-Appellant Trevor Murray*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................... ii

PRELIMINARY STATEMENT ...........................................................................1

STATEMENT OF THE CASE ..............................................................................4

  UBS's Case ..........................................................................................................5

  Murray's Case ....................................................................................................6

  The Supreme Court's Decision .......................................................................10

ARGUMENT.........................................................................................................12

   I.    The Initial Instruction on Contributing Factor was Not Error...................12

  II.   UBS was Comfortable with the Clarifying Instruction in Its Entirety,
       and the Jury Charge on Contributing Factor was Not Error,
       Let Alone Plain Error........................................................................................20

  III.  Any Error in the Initial Instruction was Harmless
       and Not Prejudicial to UBS.............................................................................23

CONCLUSION .....................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Addis v. Dep't of Lab.*, 575 F.3d 688 (7th Cir. 2009) ..............................13

*Allen v. Admin. Rev. Bd.*, 514 F.3d 468 (5th Cir. 2008) .........................13

*Anderson v. Branen*, 17 F.3d 552 (2d Cir. 1994).....................................22

*Araujo v. NJ Transit Rail Operations, Inc.*, 708 F.3d 152 (3d Cir. 2013) ..............13

*Emamian v. Rockefeller Univ.,* 971 F.3d 380 (2d Cir. 2020) ..................22

*Feldman v. L. Enf't Assocs. Corp.,* 752 F.3d 339 (4th Cir. 2014) ...........13

*Frost v. BNSF Ry. Co.*, 914 F.3d 1189 (9th Cir. 2019) ...........................13

*Girden v. Sandals Int'l,* 262 F.3d 195 (2d Cir. 2001)...............................22

*Kuduk v. BNSF Ry.Co.*, 768 F.3d 7861 (8th Cir. 2014).............................13

*Majali v. U.S. Dep't of Labor,* 294 F. App'x 562 (11th Cir. 2008)..........13

*Marano v. DOJ,* 2 F.3d 1137 (Fed. Cir. 1993) ................................ 12, 13

*Miller v. Inst. for Def. Analyses,* 795 F. App'x 590 (10th Cir. 2019) .....................13

*Murray v. UBS Sec., LLC,* 43 F.4th 254 (2d Cir. 2022),
   *rev'd* 144 S.Ct. 445 (2024) ........................................................ *passim*

*Murray v. UBS Sec., LLC,* 144 S.Ct. 445 (2024)........................... *passim*

*Norfolk S. Ry. Co. v. United States Dep't of Lab.,* No. 21-3369,
   2022 WL 17369438 (6th Cir. Dec. 2, 2022) ........................................13

*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)................................15

*United States v. White*, 552 F.3d 240 (2d Cir. 2009)...............................22

**Statutes**

5 U.S.C. § 1221(e)(1)...............................................................................11

**Other Authorities**

135 Cong. Rec. 5032, 50333 (1989) ...........................................................12

Merriam-Webster Collegiate Dictionary (10th Ed., 1993) .......................................13

Webster's New World College Dictionary (4th Ed., 1999)......................................13

Transcript of Second Circuit Oral Argument, No. 20-4202, 21-56 ................. 16, 18

Transcript of Supreme Court Oral Argument, No. 22-660 ................... 5, 14, 15, 24

## PRELIMINARY STATEMENT

Congress defined "contributing factor" to mean "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." That definition has stood for 35 years. It has routinely been used in jury instructions in SOX and other AIR21 whistleblower cases. Virtually all the Circuits have approved it. When this case was tried in 2017, the initial jury instruction defining contributing factor was a well-established rule of law. It was so well established that UBS proffered a proposed charge prior to trial that, but for the excision of the words "tended to," mirrored the Congressional definition.

Although this Court dropped a footnote suggesting that the established definition hypothetically could be inadequate in two ways, "inadequacy" is not legal error, let alone prejudicial error, and this Court did not hold that the initial instruction constituted reversible error. Instead, it vacated the jury's verdict on the sole ground that the contributing factor instruction did not contain a requirement for plaintiff to prove "retaliatory intent." *Murray v. UBS Sec., LLC,* 43 F.4th 254, 259-60 (2d Cir. 2022), *rev'd* 144 S.Ct. 445 (2024).[1]

There were good reasons why this Court rejected UBS's suggestion that the initial definition's alleged deficiencies constituted reversible error. First, the

---

[1] The Supreme Court agreed: "UBS is wrong to characterize the Second Circuit's footnoted discussion [] as an alternative holding." 144 S.Ct. at 455 n.2 (2024).

hypothetical possibilities in this Court's footnoted discussion were foreclosed by the evidentiary record and parties' closing arguments to the jury. There was no support for the suggestion that "Murray was insulated by his protected activity from a termination to which he would otherwise have been subjected sooner" – UBS conducted no investigation of Murray's protected activity, and he was quickly fired in the first RIF after his complaints of illegality. Nor was there any possibility that, in imposing liability on UBS, the jury looked beyond whether Murray's whistleblowing activity was an actual cause of his termination in light of their verdict that Murray would not have been fired absent that activity.

Second, this Court was aware of the clarifying instruction – explicitly approved by UBS – that (1) removed the "tended to" language to which UBS had primarily objected, (2) aligned perfectly with UBS's own proposed jury charge defining contributing factor, JA91, and (3) added "because of" in order to strengthen the requisite connection between the protected activity and the termination. The supplemental instruction further removed the hypothetical concerns about the initial instruction from any significance in this case, and UBS's endorsement of the supplemental instruction effectively waived its objection to the initial instruction.

Third, and most significantly, while UBS does not mention in its Supplemental Brief the jury's finding that UBS failed to prove it would have fired

Murray absent his protected activity, that finding conclusively established that his protected activity "actually caused," "had a share in bringing about," "contributed to," "had some share or agency in producing," "was partially responsible for," "played some role in producing" and "was a reason for" his termination. UBS Supp. Br. 2, 3, 10, 12. UBS has never challenged that finding, the sufficiency of the evidence supporting it, or the jury instructions pertaining to it. Accordingly, any "inadequacy" in the initial contributing-factor instruction did not affect the jury's liability determination.

This Court effectively recognized this by (1) upholding the jury's finding that Murray's protected activity was a contributing factor in his termination, and (2) basing its verdict vacatur solely on the lack of a retaliatory intent requirement, not on any other purported deficiencies in the jury instructions' definition of contributing factor. 43 F.4th at 262:

> [A]lthough the jury did not find that UBS prove[d] by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of [Murray's] protected behavior, this does not mean that Murray proved by a preponderance of the evidence that UBS acted with retaliatory intent in terminating Murray. In other words, even though the jury found that Murray's whistleblowing was a contributing factor to his termination, we cannot know whether it would have found that UBS acted with retaliatory intent. We are thus unconvinced that the erroneous jury instruction did not influence the verdict, and we accordingly remand to the district court for a new trial.") (*internal quotation marks and citation omitted*).

This Court was correct to sustain the jury's finding that "Murray's whistleblowing was a contributing factor to his termination[.]" Implicit in that holding was a determination that any perceived inadequacy in the initial instruction did not prejudice UBS. This is especially true considering the charge as a whole and the unchallenged jury finding at the second step of the burden-shifting mechanism that the Supreme Court has now endorsed.

This Court's holding has now been buttressed by the Supreme Court's unanimous holding that the burden-shifting mechanism "worked as it should" in this case: "that Murray had shown that his protected activity was a contributing factor in his firing while UBS had not shown that it would have taken the same action in the absence of his protected activity." 144 S.Ct. at 455.

To reverse this verdict for any perceived inadequacy in the initial instruction, in the face of the Supreme Court's decision and this Court's original decision – 12 years after Murray was fired and six-plus years after trial – would be a travesty of justice.

## STATEMENT OF THE CASE

Perhaps the best way to review the evidentiary record and see how the case was actually presented to the jury is to do what Justice Kavanaugh did: review the

closing arguments. SCOTUS Tr. 83-85. Here is how the parties presented their case:[2]

## UBS'S CASE

UBS's counsel told the jury that there were "essentially two different versions of these events" for it to choose between. SDNY Dkt. 274 (Tr. 2215). UBS's version was that Murray was fired solely for financial reasons. Murray's testimony was "a story" – a complete fabrication, *Id.* (Tr. 2223). There was no illegal pressure ever placed on Murray, and he never "blew the whistle," as he never reported any pressure to Schumacher. *Id.* (Tr. 2223-43). Thus, Murray was not laid off because of his supposed whistleblowing; his "position would have been eliminated regardless of any whistleblowing," *Id.* (Tr. 2252-53), because "UBS had to cut costs," *Id.* (Tr. 2256), and "Murray's position was a cost that it could not afford," *Id.* (Tr. 2264), so he "would have been laid off no matter what he said or did." *Id.* (Tr. 2257). Counsel characterized Schumacher's alternative suggestion of moving Murray to a desk analyst position "as a way to potentially save Mr. Murray's job," *Id.* (Tr. 2265), but counsel did not argue that the decision insulated Murray from termination or delayed such termination, nor did he cite any evidence

---

[2]    We respectfully refer the Court to our original brief, Dkt. 81, at 4-22, 35-46, 53, for a full exposition of and record support for plaintiff's evidence.

of such insulation or delay. Instead, counsel simply said the alternative suggestion "didn't work out," *Id.* (Tr. 2265), and Murray was fired.

## MURRAY'S CASE

Murray's counsel proceeded to take apart UBS's version of events. To believe it, the jury would have to believe that after an unblemished 10-15 year career as a rising researcher and strategist who was recruited to every job he had, including twice to UBS, Murray "suddenly went rogue," and decided to make up a false story to become a whistleblower instead of getting another job at an investment bank – destroying himself and his career in the process. *Id.* (Tr. 2284-85).

UBS admitted to OSHA that Schumacher was one of two decision-makers in Murray's termination, along with Hatheway. *Id.* (Tr. 2289, 2296); JA1797. Schumacher was the one who first proposed that Murray be fired, on January 11, 2012, when Schumacher emailed Hatheway recommending that Murray be removed from his headcount. JA1544.[3] Schumacher's alternative suggestion that Murray be moved to a desk analyst position (where he would not have SEC

---

[3] Hatheway testified that, on January 3, he had made a list in his head of those he wanted to terminate in the Project Doral RIF which included Murray and Shumin Li. But the documentary evidence included emails in early January 2012 in which Hatheway told his supervisors that he had not yet made any selections in the MBS area. JA1542; JA1220-21. And when Hatheway first wrote down this list in his head of people for layoff, there were 12 strategists listed by title, none of whom were Murray or Li. JA1539. SDNY Dkt. 274 (Tr. 2305-06). JA1215; JA1545. As the district court noted, this testimony was "discreditable" and "palpabl[y] imprecise[e]." SA16-18.

independence certification responsibilities) was contained in the same email.[4]  This was less than a month after Murray's first protected report of illegality to Schumacher, and shortly after Schumacher had prepared his highly-rated performance evaluation of Murray. SDNY Dkt. 274 (Tr. 2289, 2290, 2295, 2296); JA535; JA541-42; JA1544; JA1212-13; JA1547; JA1797.

Schumacher's January 11 termination recommendation came four days after Hoornweg, the global co-head of FICC – superior in authority to Schumacher, Hatheway, Steinart and Amin – told Hatheway on January 7 that UBS was *not* deemphasizing CMBS, and that headcount reductions would take place in other businesses that UBS was deemphasizing. SDNY Dkt. 274 (Tr. 2300); JA1194-95; JA1197; JA1538; JA1876.  Less than a month before he proposed firing Murray, Schumacher confirmed in an email to his bosses that the CMBS business was fairly profitable, JA1532, unlike the nonagency MBS and other mortgage strategy businesses. SDNY Dkt. 274 (Tr. 2299); JA1532.  In November 2011, Cohen emailed that the CMBS business would be completely unaffected by the events that UBS contended resulted in a change in its CMBS business plans.  SDNY Dkt. 274 (Tr. 2301); JA1490.  Shortly thereafter, in an Investor Day presentation, UBS

---

[4]    That Schumacher put his alternative recommendation in the same email as his termination recommendation undermines UBS's mistaken suggestion that Schumacher "first attempted to move Plaintiff into a different role because of his protected activity" *before* recommending Murray be fired. Dkt. 144, at 34.

characterized CMBS as an attractive core business of the bank, to which it was committed.[5]  JA930; JA1344-45; SDNY Dkt. 274 (Tr. 2301).

After Schumacher broached the idea on January 11 of moving Murray to a CMBS desk analyst, the idea was dropped – it never appeared again in any document or email, it was never mentioned to Murray, and Cohen testified that he never heard about it and wasn't even sure what a desk analyst was.  *Id.* (Tr. 2296); JA843-44; JA852-53. What Cohen wanted, he testified, was a CMBS publishing analyst because it was important to his business.  JA850; SDNY Dkt. 274 (Tr. 2296).

On January 13, two days after Schumacher recommended Murray's termination, Schumacher responded to Murray's second protected complaint of illegal pressure by again advising him to write what the business line wants.  *Id.* (Tr. 2295); JA294-95.  Schumacher reviewed with Murray his favorable performance evaluation indicating that he would continue to be employed, and never told Murray that his job was in jeopardy, or suggested that he look for another job internally, as Schumacher and Hatheway had done for Shumin Li,

---

[5]    UBS remained committed to its CMBS business as a "profitable," "core," and "attractive" business for years after Murray's termination, adding to, rather than reducing, its headcount of CMBS staff.  Dkt. 81 at 10-14, Dkt. 128 at 5-7. The CMBS business went from virtually nothing in Spring 2011, when both Murray and Cohen were recruited to UBS, to 30, then to 35, and ultimately to 49, including contractors.  JA187-89; JA193; SDNY Dkt. 274 (Tr. 2285). Staffing never decreased.  *Id.* (Tr. 2298); JA809-10; JA883; JA897-905; JA0910.  Before 2011 ended, the bank had become a top 10 CMBS business performer.  SDNY Dkt. 274 (Tr. 2299-2300, 2302); JA1341-42.

notwithstanding that Murray's performance was superior to Li's. JA523-24; JA697-99; JA1547. Instead, they sprung Murray's firing on him on February 6, with no prior warning. SDNY Dkt. 274 (Tr. 2294); JA304-05.

All this was strong evidence that Murray's protected activity – not legitimate financial reasons resulting from a deemphasized CMBS business – was the actual cause of Murray's termination. The notion that UBS could not afford Murray's compensation of $250,000 in salary plus bonus between $125,000 to $250,000 for a CMBS publishing strategist who UBS had just recruited back to help Cohen and McNamara restart the CMBS business (JA440; JA1433; JA1435), and which Cohen said was important to that business, was laughable in light of McNamara's and Cohen's bonuses of $3 million and $2.1 million respectively for 2011. SDNY Dkt. 274 (Tr. 2304); JA748-49, JA1009-10.

On January 18, five days after the January 13 meeting, Murray's name first appeared on a list of people who were going to be terminated in the Operation Doral RIF at the end of January or February – Murray having been substituted for another strategist, Ahrens, in U.S. Rates, a separate strategy group. SDNY Dkt. 274 (Tr. 2295); JA1544; JA1552; JA1212-13. An earlier RIF in 2011, Project Sapphire, was completed before Murray complained. Operation Doral was the next one. JA1552. Thus, Murray was terminated at the earliest opportunity after

his protected activity, and there was no delay in his firing – and no insulation from it – resulting from Murray's protected activity.  SDNY Dkt. 274 (Tr. 2302-03.)

The evidence that Murray's protected activity was the cause of his termination was not merely circumstantial.  There was direct, overwhelming evidence that the idea for Murray's termination came from Schumacher, prompted by Murray's protected complaints of illegality.  JA1544

## THE SUPREME COURT'S DECISION

The Supreme Court has now ruled out retaliatory intent as an element of a SOX/AIR21 whistleblower's case in chief, noting that "Congress here has decided that the plaintiff's burden on intent is simply to show that the protected activity was a 'contributing factor in the unfavorable personnel action.'" 144 S.Ct. at 454. (citations omitted).  This burden can be shown by circumstantial evidence, like that which caused this Court to find that there was "'circumstantial evidence at trial that UBS terminated Murray in retaliation for whistleblowing,' such as the close temporal proximity between Murray's whistleblowing and termination and the fact that Schumacher had given Murray a good performance evaluation prior to his whistleblowing. 43 F.4th, at 262." *Id*., at 452.

That temporal proximity[6] plus a good prior performance evaluation is now sufficient to prove contributing factor and shift the burden to the employer to show that protected activity was not a basis for adverse personnel actions, means that plaintiff's contributing-factor burden is not to show actual causation, but only that the protected activity appears to have been one step in the causal link bringing about, or leading to, the termination.  Everything the Supreme Court wrote is consistent with that interpretation, including:

- that "the phrase 'contributing factor' is broad indeed," and that "the contributing-factor standard in Sarbanes-Oxley reflects a judgment that 'personnel actions against employees should quite simply not be based on protected [whistleblowing] activities' – not even a little bit." *Murray*, *Id*., at 455.

- that the burden-shifting framework, "is meant to be more lenient than most," that "discriminatory intent is difficult to prove," that employers "contro[l] most of the cards," and that burden shifting plays the necessary role of "forcing the defendant to come forward with some response" to the employee's circumstantial evidence. *Id.,* at 454.

---

[6]    The text of the WPA explicitly states that a showing of knowledge plus temporal proximity will suffice to prove contributing factor. 5 U.S.C. § 1221(e)(1).

- "Here, the burden-shifting framework worked as it should[.] The jury heard both sides of the story. It then determined that Murray had shown that his protected activity was a contributing factor in his firing while UBS had not shown that it would have taken the same action in the absence of his protected activity. That burden shifting [] is what the statute requires." *Id.,* at 455.

The Supreme Court's holdings effectively constitute an endorsement of the jury charge, the jury's contributing-factor finding, and its liability verdict.

## ARGUMENT

## I

## The Initial Instruction on Contributing Factor was Not Error

The broad definition of protected activity as a "contributing factor" – it must have either alone or in combination with other factors tended to affect in any way UBS's decision to terminate Murray's employment – was devised by Congress when it passed the WPA. *Marano v. DOJ,* 2 F.3d 1137, 1140 (Fed. Cir. 1993), cited favorably by the Supreme Court, 144 S.Ct. at 455: "The words 'a contributing factor' mean *any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision.*" 135 Cong. Rec. 5033 (1989) (Explanatory Statement on S. 20) (*emphasis added*).

12

Since *Marano*, this definition of contributing factor has been routinely given in SOX, FRSA and other AIR21 cases. UBS has conceded as much. Dkt. 49, at 33 n.1. Ten Circuits have adopted it.[7] UBS has never cited a single case suggesting, let alone holding it to be erroneous. Not only was this definition uniformly accepted as this trial began, but it aligns precisely with the Supreme Court's holdings in this case that (1) "whistleblowing should *never be a factor that contributes in any way* to an adverse personnel action, and (2) personnel actions against employees should quite simply not be based on protected [whistleblowing] activities' – *not even a little bit.*" 144 S.Ct. at 455.

A dictionary definition of "tend" means "to move, direct or develop one's course in a particular direction," Merriam-Webster Collegiate Dictionary (10th Ed., 1993), or "lead or be directed (to or toward a specific result)." Webster's New World College Dictionary (4th Ed., 1999). That definition aligns quite well with the Supreme Court's broad definition of contributing factor ("having a share in bringing about a result," or "any of the circumstances, conditions, etc. that bring

---

[7] *See, e.g., Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152, 158–59 (3d Cir. 2013); *Feldman v. L. Enf't Assocs. Corp.,* 752 F.3d 339, 348–49 (4th Cir. 2014); *Allen v. Admin. Rev. Bd.*, 514 F.3d 468, 476 n.3 (5th Cir. 2008); *Norfolk S. Ry. Co. v. United States Dep't of Lab.,* No. 21-3369, 2022 WL 17369438, at *9 (6th Cir. Dec. 2, 2022); *Addis v. Dep't of Lab.*, 575 F.3d 688, 691 (7th Cir. 2009); *Kuduk v. BNSF Ry.Co.*, 768 F.3d 786, 791 (8th Cir. 2014); *Frost v. BNSF Ry. Co.*, 914 F.3d 1189, 1195 (9th Cir. 2019); *Miller v. Inst. for Def. Analyses,* 795 F. App'x 590, 597 (10th Cir. 2019); *Majali v. U.S. Dep't of Labor,* 294 F. App'x 562, 566 (11th Cir. 2008); *Marano v. DOJ*, 2 F.3d 1137 (Fed. Cir. 1993).

13

about a result.").[8]  Here, the jury clearly understood that the only "result" at issue was Murray's termination, not the never-pursued desk-analyst transfer idea.

Congress's definitional use of "tends to" also aligns well with the Supreme Court's holding that a SOX or AIR21 whistleblower's contributing-factor burden does not include proof that the protected activity actually brought about or caused the termination; (s)he only has to prove that the protected activity was a step in the causal link bringing about or leading to the termination.  At that point, the "series of evidentiary burdens [in the SOX and AIR21 framework] are intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination," "forcing the defendant to come forward with some response to the employee's circumstantial evidence." 144 S.Ct. at 454.

The Supreme Court's emphasis on circumstantial evidence also makes clear that the contributing factor element of the claim does not require plaintiff to bring forward direct or conclusive evidence of actual causation.  Instead, it is only after the jury considers the defendant's responsive evidence at step 2 that the jury "has the full picture before it and can make the ultimate determination as to whether the

---

[8]    UBS is therefore mistaken in suggesting that the tend-to-affect-in-any-way definition is inconsistent with the Supreme Court's broad definition of contributing factor, or that Murray conceded as much in the Supreme Court. Dkt. 222, 18-19.  At oral argument, Murray's counsel urged the Court "to say that 'contributing factor' is a term of art that means 'tend to affect in any way,'" noting that (1) Congress well was aware of that definition when it incorporated it into SOX, and (2) it aligned well with Congress's choice of "contributing factor" rather than "motivating factor."  SCOTUS Tr. 21, 97-99.

14

employer intentionally treated the employee differently, and worse, because of the employee's protected [] activity." *Id*. Thus, the Supreme Court's decision makes clear that the "tended to affect" language properly elucidates the contributing-factor element of Murray's claim.

To require Murray to prove, in the step 1 contributing-factor element, that the protected activity was an actual cause of his termination – which was UBS's fundamental contention at trial and here, *see, e.g.,* Dkt. 222, 2 – would eviscerate the burden-shifting that the Supreme Court has now mandated.[9] It would make "contributing factor" identical to "motivating factor" under *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989), which explained:

> In saying that gender played a motivating part in an employment decision, we mean that, if we asked the employer at the moment of decision what its reasons were and if we received a truthful response, one of those reasons would be that the applicant or employee was a woman.

But Congress explicitly designed the contributing factor burden-shifting framework to dispense with any motivating-factor burden. 144 S.Ct. at 449-50,

---

[9]     As Justice Kagan observed, SCOTUS Tr. 92, if the contributing factor element alone requires plaintiff to prove that the protected activity was an actual reason for the termination, "you don't need the second step of the burden-shifting analysis. [] The reason why you have the second step of the burden-shifting analysis is precisely to make that determination of whether the employer actually acted in part or in whole for that reason [the protected activity], understanding that the employer has the information, and so it makes sense to put that question on the employer's side of who has the burden to do what."

*citing* 135 Cong. Rec. 5032, 5033 (1989) (Explanatory Statement on S.20, 101ˢᵗ Cong., 1ˢᵗ Sess. (1989).

In fact, Congress's tend-to-affect definition maps quite well with the term "contributing factor" in making clear that whistleblowers need not have evidence of what was in the head of the employer-decision-maker at the moment of the termination decision before the burden shifts to the employer who, controlling most of the evidentiary cards, properly is required to prove that the termination decision had nothing to do with the protected activity.

The Supreme Court observed that this Court failed to give due consideration to the burden-shifting framework. 144 S.Ct. at 454. This may explain why this Court suggested that the tend-to-affect initial instruction was inadequate, appearing to believe (mistakenly) that the contributing factor element required Murray to prove that his "whistleblowing activity *actually* caused the termination," 43 F.4 at 259 n.4, rather than permitting the issue of actual causation to be resolved at step 2 of the burden-shifting framework.

This was exemplified during oral argument, when Judge Menashi observed that the "tended-to-affect" definition did not require "an actual effect, it's whether there's a tendency or whether it's likely to have [an effect] and so if the district court had rested only on "tended to affect," it would not have actually required a causal connection [to] impose liability." 2d Cir. Oral Arg. timestamp 27:03-27:32.

16

The Supreme Court has now put that reasoning to rest. Contributing factor does not require "an actual effect"; instead, a "tendency to affect" or "likely effect" is enough. Nor is "liability" imposed by the step 1 contributing factor finding of a tendency to affect. That finding only shifts the burden, with liability imposed only when, in this case, UBS failed to prove that it would have fired Murray absent his protected activity. It was only then that "liability" was complete.

The Supreme Court held that that was how the burden-shifting framework was supposed to work, and worked properly here: "The statute is clear that whether an employer "discriminated" has to be resolved through the contributing factor burden shifting framework that applies to SOX whistleblower claims." 144 S.Ct. at 453. "Here, the burden-shifting framework worked as it should[.]" *Id.,* at 455.

The Supreme Court also held that when "an employer treats someone worse – by firing them" or "unfavorabl[y] chang[ing] the terms and conditions of employment – 'because of' the employee's protected whistleblowing activity, the employer violates §1514A even if the employer "was motivated, for example, by the belief that the employee might be happier in a [desk analyst] position that did not have SEC reporting requirements." *Id.,* at 454. That should dispose of this Court's concern that the tended-to-affect definition might have permitted the jury to impose liability believing that Schumacher was motivated by a desire to help Murray rather than hurt him.

17

Moreover, as both Judges Menashi and Perez observed at oral argument, the district court focused the jury's attention solely on Schumacher's decision to fire Murray, not Schumacher's suggestion that Murray become a desk analyst.[10]  Both Judges noted (1) the implausibility that this jury imposed liability and awarded substantial damages against UBS because they thought UBS only benefitted Murray rather than firing him, and (2) that Schumacher's desk analyst suggestion – encompassed within his recommendation to fire Murray – was intended to help Schumacher and UBS rather than Murray, by eliminating the illegality that was the subject of Murray's protected complaints.  2d Cir. Oral Arg. Timestamp 3:38-7:50.

Finally, the evidentiary record and closing arguments made clear that Murray was never "insulated from a termination to which he would otherwise have been subjected sooner."  43 F.4th at 259 n.4.  Murray was fired in the first RIF after his protected activity, and UBS never argued, let alone presented any evidence, that Schumacher or Hatheway ever proposed firing Murray outside of the RIF.  There was no actual investigation of Murray's protected activity by anyone at UBS because Schumacher failed to escalate Murray's protected complaints.  Accordingly, there was no delay, and no insulation from a firing that would have occurred sooner.

---

[10]  Their question during deliberations about contributing factor confirmed the jury was solely concerned with the decision to "fire [Murray]" and "who contributed to th[at] decision[.]" SA12-20.

Tellingly, UBS cites no evidence of actual insulation or delay in its Supplemental Brief. While there was testimony that a report of protected activity would have delayed a termination pending investigation, UBS told the jury that no protected activity had ever occurred, so how could there have been an investigation of it? The truth was clear to the jury. Schumacher quickly recommended termination, and he and Hatheway jointly made the decision to fire Murray. Schumacher's alternative suggestion of a desk analyst job was quickly dropped, but that suggestion made clear that UBS's decision to fire Murray in the next available RIF was a result of Murray's protected activity – a way to remove the illegality without putting a stop to the unlawful pressure.

If Schumacher was not recommending termination because of Murray's protected activity, there would have been no reason for him to suggest that Murray be transferred to Cohen's desk as an analyst not subject to SEC independence regulations. After all, Cohen never requested that transfer – he wanted a publishing analyst and didn't even know what a desk analyst was. Thus, Murray's evidence was not just circumstantial evidence of contributing factor, it was direct, overwhelming evidence of both actual causation and discriminatory (and retaliatory) intent.

There was no error in the initial contributing factor instruction.

**II**

**UBS was Comfortable with the Clarifying Instruction in Its Entirety, and the Jury Charge on Contributing Factor was Not Error, Let Alone Plain Error**

UBS recognizes that the clarifying instruction during deliberations "took some force" away from the phrase "tended to," leaving only "in any way."  Dkt. 222, at 20.  Notably, "in any way" perfectly aligns with "not even a little bit."  144 S.Ct. at 455.  It is also indisputable that the trial judge's supplemental formulation – with which UBS pronounced itself "comfortable," JA1416 – mirrored the proposed contributing-factor charge that UBS itself had proffered just before trial. JA91. Accordingly, UBS's argument here is essentially that it did not have to object to the clarifying instruction because it had already objected to the "tended to affect" language in the Court's original charge and any further objections would have been an "empty exercise."  (UBS Supp. Br. 15-16). But that argument ignores what UBS's counsel said during the critical colloquy and this Court's jurisprudence.

In response to the jury's note, the district court informed the attorneys that it intended to instruct the jury as follows:

> "[T]he request for a clarification of 'tended to affect in any way' to my mind is a question that requires a fair amount of thought, but perhaps the parties have agreed to something. I was going to commend to them pages 21 and 22 of the charge, but I don't know that that is responsive. []. But I think -- to my mind, the answer is that they ought to -- and I'm not saying I'm going to tell them this. I'm just saying in my mind, they ought to consider who had knowledge of the

20

protected activity and did anyone with knowledge of the protected
activity, because of the protected activity, affect the decision to
terminate Mr. Murray's employment."

(JA1414-15.)  UBS's counsel's responded:

"You know, we are somewhat concerned that this question reflects a
confusion about what 'tended to affect in any way' means.[]  I think
that we would be comfortable with the formulation your Honor just
proposed a moment ago, or the response."

(JA1416.)  When the court shared its fully formulated response, which contained
the reference back to the original instruction, counsel did not object to that
reference, notwithstanding her expressed concern with the original instruction's
"tended to affect in any way" language.  To the contrary, counsel confirmed that it
had no objections. (JA1418-19.)

The context of the colloquy makes clear that objecting to the clarifying
instruction would not have been an "empty exercise."  The court and UBS clearly
understood that the jury was seeking clarification about the initial contributing
factor instruction's "tended to affect in any way" language, that repeating the
original definition would not respond to the jury's questions about it, and that the
court was seeking the parties' assistance in formulating an alternative instruction
on how the jury should go about determining whether Murray's protected activity
was a contributing factor to his termination.  Because the court was actively
seeking the parties' assistance in formulating that instruction, this was clearly a
time when objecting to the court's formulation with the reference back included

21

would *not* have been an empty exercise. Instead, UBS expressed itself entirely "comfortable" with the court's alternative formulation, explicitly consenting to it with the earlier instruction, even though the court had clearly stated it did not think the earlier instruction was responsive.

Where, as here, counsel specifically consents to a supplemental instruction, this Court reviews both the initial and supplemental charge for plain error. *United States v. White*, 552 F.3d 240, 249 (2d Cir. 2009). To constitute plain error, "a court's action must affect substantial rights, contravene an established rule of law, and go to the very essence of the case." *Emamian v. Rockefeller Univ.,* 971 F.3d 380, 387-88 (2d Cir. 2020). As we noted above, at this 2017 trial, the initial contributing-factor instruction indisputably *was* the established rule of law, and the clarifying instruction reflected exactly what UBS had proffered as a proposed charge. Any colorable error in the initial instruction could not have affected UBS's substantial rights. Nor did it go to the essence of the case as it was tried by UBS, who essentially argued that there was no protected activity, and that Murray was fired solely for financial reasons.[11]

---

[11] UBS's cases are inapposite. *Girden v. Sandals Int'l*, 262 F.3d 195, 202 (2d Cir. 2001), did not involve a supplemental or curative instruction, and counsel there specifically objected to the proposed instruction during the charge conference and again "in the robing room on the morning the jury was charged[.]" *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994), also did not involve supplemental or curative instructions.

22

## III

## Any Error in the Initial Instruction was Harmless and Not Prejudicial to UBS

This Court already determined that any inadequacy in the initial instruction was harmless and did not prejudice UBS.  This Court held that (1) "the jury found that Murray's whistleblowing was a contributing factor to his termination," (2) "[t]o be sure, there was circumstantial evidence that UBS terminated Murray in retaliation for whistleblowing[,]" and (3) the jury rejected UBS's defense that it would have fired Murray in the absence of his protected behavior.  43 F.4th at 262.  Under the law of the case now set by the Supreme Court, that is all that is necessary to support the liability verdict against UBS.  Because this Court found the jury instructions prejudicial solely because they did not require the jury to find retaliatory intent, this Court effectively found that any other inadequacies in the definition of contributing factor were harmless to UBS.[12]  That finding was correct, and nothing in the Supreme Court's decision, this factual record or UBS's Supplemental Brief suggests otherwise.  Indeed, UBS does not even mention the jury's verdict rejecting its defense,[13] which indisputably established both actual

---

[12]    UBS never introduced any evidence nor argued to the jury that Murray's protected activity delayed Murray's termination or insulated Murray from termination.  Nor does it cite such evidence in its Supplemental Brief.

[13]    UBS doubtless will have some words about the step 2 verdict in its reply, when Muray will be unable to respond.

causation and discriminatory intent,[14] but UBS made a critical concession about it at the Supreme Court.

In a telling exchange at oral argument, UBS's counsel agreed with Justice Kavanaugh that the jury had to decide between two different versions of events, and that UBS's defense – that UBS had not fired Murray nor intended to fire Murray because of his protected activity – got to the jury (and was rejected). SCOTUS Tr. 83. Justice Kavanaugh observed that if the jury had believed Schumacher in saying that Murray was fired for a reason other than his protected reports of illegality, UBS would have won because the jury instructions put that issue before the jury. Counsel did not demur; he responded only that the jury was given too easy a path to find against UBS "because of the burden flip" and because the jury was not instructed that plaintiff had the burden of proving intent to retaliate.[15] Id., 87-88. Thus, UBS effectively acknowledged that (1) the other "inadequacies" of which it complains were harmless, and (2) the critical liability issue – whether Murray's protected activity was a reason for his firing – was resolved by the jury with its decision at the "burden-flip" (step 2 of the burden-

---

[14]    In *Price Waterhouse*, the Supreme Court elucidated the meaning of a verdict adverse to the employer at step 2: "where an employer is unable to prove its claim that it would have made the same decision in the absence of discrimination, we are entitled to conclude that gender *did* make a difference to the outcome." 49 U.S. at 246, n. 11. Accordingly, the jury's verdict at step 2 conclusively established that UBS fired Murray because of his protected activity.

[15]    Notably, counsel did not attribute UBS's loss to any other inadequacy in the contributing factor instruction.

shifting framework), a decision UBS has always left unchallenged, along with the sufficiency of the evidence and the adequacy of the instructions pertaining to it.

In sum, the unchallenged, conclusive determinative factor in this case is that UBS failed to persuade the jury that it would have fired Murray absent his protected activity, making clear that UBS was liable to Murray because he was fired, in whole or in part, "because of" his protected activity. The Supreme Court has so held.  144 S.Ct. at 455 ("Here, the burden-shifting framework worked as it should").

## **CONCLUSION**

This Court should reinstate the jury's liability verdict and determine the cross-appeal.

Respectfully submitted,

HERBST LAW PLLC

/s/ Robert L. Herbst

_____
Robert L. Herbst
Benjamin J. Ashmore, Sr.
420 Lexington Avenue, Suite 300
New York, New York 10170
Tel: (914) 450-8163
rherbst@herbstlawny.com
ben.ashmore.sr@ashmore.law
*Counsel to Trevor Murray*

25

STULBERG & WALSH

/s/ Robert B. Stulberg

_____

Robert B. Stulberg
Patrick J. Walsh
14 Wall Street, Suite 5G
New York, NY 10005
Tel: (212) 268-1000
rstulberg@stulbergwalsh.com
pwalsh@stulbergwalsh.com
*Counsel to Trevor Murray*

SCOTT A. KORENBAUM, ESQ.

/s/ Scott A. Korenbaum

_____

Scott A. Korenbaum
14 Wall Street, Suite 1603
New York, NY 10005
Tel: (212) 587-0018
scott@korenbaumlaw.com
*Counsel to Trevor Murray*

April 25, 2024

**CERTIFICATE OF COMPLIANCE**

I certify that:

    1. This supplemental brief complies with the type-volume limitation of this Court's March 14, 2024 order because, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f), it contains 5,990 words, as determined by the word-count function of Microsoft Word.

    2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point, Times New Roman font.

Dated: April 25, 2024                    /s/ Robert L. Herbst

                                         Robert L. Herbst, Esq.