20-4202-cv (L)
Murray v. UBS Securities

# United States Court of Appeals
# for the Second Circuit

August Term, 2021

(Argued: April 1, 2022      Decided: August 5, 2022)

Docket Nos. 20-4202(Lead), 21-56(Con)

—————————————————————

TREVOR MURRAY,

*Plaintiff-Appellee-Cross-Appellant*,

v.

UBS SECURITIES, LLC, UBS AG,

*Defendants-Appellants-Cross-Appellees*.

—————————————————————

Before:

     PARK, MENASHI, and PÉREZ, *Circuit Judges*.

Plaintiff Trevor Murray claims that UBS Securities, LLC and UBS AG (together "UBS") fired him in retaliation for reporting alleged fraud on shareholders to his supervisor. Murray sued UBS under the whistleblower protection provision of the Sarbanes-Oxley Act ("SOX"), 18 U.S.C. § 1514A, and he ultimately prevailed at trial. The district court (Failla, *J.*), however, did not instruct the jury that a SOX antiretaliation claim requires a showing of the employer's retaliatory intent. Section 1514A prohibits publicly traded companies from taking adverse employment actions to "discriminate against an employee . . . because of" any lawful whistleblowing act. 18 U.S.C. § 1514A(a). We hold that this provision requires a whistleblower-employee like Murray to prove by a preponderance of the evidence that the employer took the adverse employment action against the whistleblower-employee with retaliatory intent—*i.e.*, an intent to "discriminate

1   against an employee . . . because of" lawful whistleblowing activity.  The district
2   court's legal error was not harmless.  We thus vacate the jury's verdict and remand
3   to the district court for a new trial.
4
5                                    THOMAS G. HUNGAR (Christopher Smith,
6                                    Anna Casey, Gibson, Dunn & Crutcher LLP,
7                                    Washington, D.C.; Gabrielle Levin, Gibson,
8                                    Dunn & Crutcher LLP, New York, NY, *on the*
9                                    *brief*), Gibson, Dunn & Crutcher LLP,
10                                   Washington, D.C., *for Defendants-Appellants-*
11                                   *Cross-Appellees.*
12
13                                   ROBERT L. HERBST (Robert B. Stulberg,
14                                   Patrick J. Walsh, Stulberg & Walsh, LLP,
15                                   New York, NY; Scott A. Korenbaum, New
16                                   York, NY; Benjamin J. Ashmore, Sr., Herbst
17                                   Law PLLC, New York, NY, *on the brief*),
18                                   Herbst Law PLLC, New York, NY, *for*
19                                   *Plaintiff-Appellee-Cross-Appellant*.
20
21  PARK, *Circuit Judge*:

22          Plaintiff Trevor Murray claims that UBS Securities, LLC and UBS AG

23  (together, "UBS") fired him in retaliation for reporting alleged fraud on

24  shareholders to his supervisor.  Murray sued UBS under the whistleblower

25  protection provision of the Sarbanes-Oxley Act ("SOX"), 18 U.S.C. § 1514A, and he

26  ultimately prevailed at trial.  The district court (Failla, *J.*), however, did not instruct

27  the jury that a SOX antiretaliation claim requires a showing of the employer's

28  retaliatory intent.  Section 1514A prohibits publicly traded companies from taking

1    adverse employment actions to "discriminate against an employee . . . because of"

2    any lawful whistleblowing act.  18 U.S.C. § 1514A(a).  We hold that this provision

3    requires a whistleblower-employee like Murray to prove by a preponderance of

4    the evidence that the employer took the adverse employment action against the

5    whistleblower-employee with retaliatory intent—*i.e.*, an intent to "discriminate

6    against an employee . . . because of" lawful whistleblowing activity.  The district

7    court's legal error was not harmless.  We thus vacate the jury's verdict and remand

8    to the district court for a new trial.

9    **I.  BACKGROUND**

10    A.    <u>Factual Background</u>

11    In 2011, UBS hired Murray as a strategist in its commercial mortgage-backed

12    securities ("CMBS") business.  Murray was "responsible for performing research

13    and creating reports that were distributed to [UBS's] current and potential clients

14    about CMBS products, services and transactions."  Am. Compl. ¶ 2.  As a CMBS

15    strategist, Murray was required by Securities and Exchange Commission ("SEC")

1    regulations to certify that his reports were produced independently and that they

2    accurately reflected his own views.[1]

3        According to Murray, two leaders of UBS's trading desk—Ken Cohen, the

4    head of the CMBS trading desk, and Dave McNamara, the head CMBS trader—

5    improperly pressured him to skew his research and to publish reports to support

6    their business strategies.  For example, Murray testified that in September 2011,

7    Cohen told him "if we're going to accomplish what we want to accomplish as a

8    business, it's important that we maintain consistency of message between

9    originations, trading desk, and research," and that "it would be best if you clear

10    your research articles with the [trading] desk going forward," and McNamara

11    agreed.  App'x at 254.  This made Murray "very concerned" because he "was faced

12    with the dilemma of how to maintain a relationship with [his] client while

13    maintaining integrity as a researcher."  *Id*. at 255.

---

[1] Specifically, Murray was required to "include in [his] research report[s] a clear and prominent certification . . . containing . . . [a] statement attesting that all of the views expressed in the research report accurately reflect the research analyst's personal views about any and all of the subject securities or issuers; and . . . [a] statement attesting that no part of the research analyst's compensation was, is, or will be, directly or indirectly, related to the specific recommendations or views expressed by the research analyst in the research report."  17 C.F.R. § 242.501(a).

1    Murray reported this conduct to his direct supervisor, Michael Schumacher,

2    in December 2011 and again in January 2012.  In December, Murray met privately

3    with Schumacher and told him:

4        [M]y relationship with my client had become untenable, that [Cohen
5        and McNamara] had told me to preclear my articles, which I had been
6        doing; that they wanted me . . . to be nothing more than a shill for the
7        market.  The only feedback I had gotten [about the articles] for the
8        most part was just negative . . . .  [I] [t]old [Schumacher] about the
9        reaction I got from both [Cohen] and [McNamara] about [one of my
10       research] article[s] and that I was like I don't know how [Cohen] got
11       away with this. . . .  But this type of relationship was completely
12       foreign to me; and that it wasn't just unethical, it was illegal, and I
13       wanted it to stop.
14
15   *Id*. at 283.  According to Murray, Schumacher responded: "I sympathize with your

16   situation.  It is a tough position to be in when you have a dour view of the market

17   that is in conflict [with] . . . your internal client but it is very important that you do

18   not alienate your internal client."  *Id*.

19       The following month, Murray met with Schumacher to go over his

20   performance review.  Afterwards, Murray "told [Schumacher] once again that the

21   situation with [his] client," referring to the UBS trading desk, "was bad and getting

22   worse."  *Id*. at 294.  Murray explained that he had been left out of meetings that

23   "would normally be a normal part of [his] job function" and outlined Cohen and

24   McNamara's "constant efforts to skew [his] research dating back to the

1    beginning." *Id*. at 294–95. Schumacher responded that "these were the confines

2    under which [you] should expect [your] job to be, . . . [you're] going to have to

3    operate, and . . . just . . . write what the business line wanted." *Id*. at 295.

4        Shortly after this, Schumacher emailed his supervisor, Larry Hatheway,

5    recommending that UBS "remove [Murray] from our head count." *Id*. at 539,

6    1,544. Alternatively, he suggested that "[i]f Ken Cohen and the CMBS team want

7    to keep a presence in analysis, they can move [Murray] onto the desk" as a desk

8    analyst, unregulated by the SEC. *Id*. at 539–40, 1,544. Schumacher continued that

9    "[o]therwise, we will make the tough call," which Schumacher later explained

10   meant that "[Murray] would be a candidate for termination." *Id*. at 540, 1,544. The

11   CMBS trading desk declined to take Murray on as a desk analyst, and UBS

12   terminated him in February 2012.

13       Murray contends that his termination was retaliation for whistleblowing.

14   UBS asserts that it terminated Murray due to a shift in strategy prompted by

15   financial difficulties. Indeed, UBS had implemented a series of reductions in force,

16   including one in February 2012 which resulted in the elimination of Murray's

17   position.

1  B.  Procedural History

2  Murray sued UBS in 2014.[2]  He alleged that he was terminated by UBS in

3  response to his complaints about fraud on shareholders in violation of the

4  Sarbanes-Oxley Act's antiretaliation provision, 18 U.S.C. § 1514A.[3]  The case went

5  to trial before a jury.  UBS moved for judgment as a matter of law, which the

6  district court denied.  The district court then instructed the jury on the elements of

7  a section 1514A claim:

8      First, that plaintiff engaged in activity protected by Sarbanes-Oxley;
9
10     Second, that UBS knew that plaintiff engaged in the protected
11     activity;
12
13     Third, that plaintiff suffered an adverse employment action -- here,
14     the termination of his employment at UBS; and
15
16     Fourth, that plaintiff's protected activity was a contributing factor in
17     the termination of his employment.
18
19                          *      *      *
20
21     For a protected activity to be a contributing factor, it must have either
22     alone or in combination with other factors tended to affect in any way
23     UBS's decision to terminate plaintiff's employment.  Plaintiff is not
24     required to prove that his protected activity was the primary

---

[2] Murray first sued UBS in 2012 for violating the Dodd-Frank Act's antiretaliation provision, 15 U.S.C. § 78u-6(h), but the district court granted UBS's motion to compel arbitration.

[3] Murray also sued for violation of 12 U.S.C. § 5567(b), but that cause of action is not at issue in this appeal.

1    motivating factor in his termination, or that UBS's articulated reasons
2    for his termination . . . was a pretext, in order to satisfy this element.
3
4  App'x at 1,389–90, 1,393.  UBS objected to these jury instructions, arguing that they

5  lacked a key element of a section 1514A claim: proof of UBS's retaliatory intent in

6  taking the adverse employment action.   The district court overruled UBS's

7  objection and the case went to the jury, which found UBS liable.  The jury also

8  returned an advisory damages verdict, determining that Murray should be

9  awarded $653,300 in back pay, no front pay, and $250,000 in non-economic

10  damages.

11       In post-trial briefing, UBS renewed its motion for judgment as a matter of

12  law or, in the alternative, for a new trial, and moved to limit Murray's back-pay

13  award.  The district court denied UBS's motions.  The district court reasoned that

14  "there is evidence to support the jury's finding as to each of the elements of the

15  Section 1514A offense, principally derived from Mr. Murray's testimony."  Sp.

16  App'x at 10.  In reaching this conclusion, the district court again did not view

17  retaliatory intent as an element of a section 1514A claim.  The district court also

18  adopted the jury's advisory verdict on damages.

19       Murray then moved for statutory attorney's fees and costs.  The district

20  court entered judgment, awarding Murray $1,769,387.52 in attorney's fees and

1    costs, as well as $653,300 in back pay, no front pay, and $250,000 in non-economic

2    damages—identical to the jury's advisory verdict on damages.  UBS appealed the

3    district court's denial of its motion for judgment as a matter of law or, in the

4    alternative, a new trial, while Murray cross-appealed the damages and attorney's

5    fees awards.

6                                      **II. DISCUSSION**

7            This appeal presents the question whether the Sarbanes-Oxley Act's

8    antiretaliation provision requires a whistleblower-employee to prove retaliatory

9    intent.  We review this legal question *de novo*.  *See United States v. Williams*, 733 F.3d

10   448, 452 (2d Cir. 2013).

11           UBS argues that the district court erred by failing to instruct the jury that

12   Murray had to prove UBS's retaliatory intent to prevail on his section 1514A claim.

13   Murray responds that there was no such error because retaliatory intent is not an

14   element of a section 1514A claim.  We conclude based on the plain meaning of the

15   statutory language and our interpretation of a nearly identical statute that

16   retaliatory intent is an element of a section 1514A claim.  The district court

17   committed a non-harmless error by failing to instruct the jury accordingly.  We

1    thus vacate the judgment and remand for a new trial on liability and do not reach

2    the cross-appeal.

3    A.    <u>The Plain Meaning of the Sarbanes-Oxley Act's Antiretaliation Provision</u>

4            First, the plain meaning of the statutory language makes clear that

5    retaliatory intent is an element of a section 1514A claim.  To interpret statutory

6    language, "we begin with the statute's text because 'we assume that the ordinary

7    meaning of the statutory language accurately expresses the legislative purpose.'"

8    *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 147 (2d

9    Cir. 2016) (quoting *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 376 (2013)).  "[U]nless

10   otherwise defined, words will be interpreted as taking their ordinary,

11   contemporary, common meaning."  *Harris v. Sullivan*, 968 F.2d 263, 265 (2d Cir.

12   1992) (citation omitted).  "If the statutory language is unambiguous and the

13   statutory scheme is coherent and consistent . . . the inquiry ceases."  *Friends of the*

14   *E. Hampton Airport*, 841 F.3d at 147–48 (citation omitted).

15           The unambiguous, ordinary meaning of section 1514A's statutory language

16   requires retaliatory intent.  Section 1514A directs that no covered employer "may

17   discharge, demote, suspend, threaten, harass, or in any other manner *discriminate*

18   against an employee . . . *because of*" whistleblowing.  18 U.S.C. § 1514A(a)

1    (emphasis added). To "discriminate" means "[t]o act on the basis of prejudice,"

2    which requires a conscious decision to act based on a protected characteristic or

3    action. *Discriminate*, WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY (1994);

4    *see Discriminate*, THE NEW OXFORD AMERICAN DICTIONARY (2001) (to "make an

5    unjust or prejudicial distinction in the treatment of different categories of people").

6    And "because of" means "by reason of" or "on account of," connoting a causal

7    relationship between the parts of the sentence the phrase connects. *See Because of*,

8    THE AMERICAN HERITAGE DICTIONARY (4th ed. 2000); *Because of*, WEBSTER'S THIRD

9    NEW INTERNATIONAL DICTIONARY (1993).

10         The statute thus prohibits discriminatory actions caused by—or "because

11   of"—whistleblowing, and actions are "discriminat[ory]" when they are based on

12   the employer's conscious disfavor of an employee for whistleblowing. *Cf. Vega v.*

13   *Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (explaining that, in

14   the Title VII context, "an action is 'because of' a plaintiff's [protected characteristic]

15   where it was a 'substantial' or 'motivating' factor contributing to the employer's

16   decision to take the action"). A discriminatory action "because of" whistleblowing

17   therefore necessarily requires retaliatory intent—*i.e.*, that the employer's adverse

18   action was motivated by the employee's whistleblowing. The plain meaning of

1    section 1514A's statutory language thus compels our conclusion that retaliatory

2    intent is required to sustain a SOX antiretaliation claim.

3        We have previously articulated the elements of a SOX antiretaliation claim

4    in *Bechtel v. Admin. Rev. Bd.*, 710 F.3d 443 (2d Cir. 2013). There, we explained that

5    "an employee must prove by a preponderance of the evidence that (1) [he]

6    engaged in protected activity; (2) the employer knew that [he] engaged in the

7    protected activity; (3) [he] suffered an unfavorable personnel action; and (4) the

8    protected activity was a contributing factor in the unfavorable action." *Id*. at 447

9    (citation omitted). The district court instructed the jury that "[f]or a protected

10   activity to be a contributing factor, it must have either alone or in combination

11   with other factors tended to affect in any way UBS's decision to terminate

12   plaintiff's employment." App'x at 1,393. But this explanation of the contributing

13   factor element fails to account for the statute's explicit requirement that the

14   employer's conduct be "discriminat[ory]."[4] We therefore hold that to prevail on

---

[4] The inadequacy of the "contributing factor" standard utilized by the district court is illuminated by the fact that "tended to affect in any way UBS's decision to terminate plaintiff's employment" could include a scenario in which Murray's whistleblowing resulted in termination, but also a scenario in which, by virtue of his whistleblowing activity, Murray was *insulated* from a termination to which he would otherwise have been subjected sooner. In addition, "tended to affect" increases the level of abstraction such that a jury might look beyond whether the whistleblowing activity *actually* caused the termination to whether it was *the sort of behavior* that would *tend to affect* a termination decision.

1    the "contributing factor" element of a SOX antiretaliation claim, a whistleblower-

2    employee must prove that the employer took the adverse employment action

3    against the whistleblower-employee with retaliatory intent—*i.e.*, an intent to

4    "discriminate against an employee . . . because of" lawful whistleblowing activity.

5    B.    Consistency with Our Interpretation of a Nearly Identical Provision in the
6          Federal Railroad Safety Act

7          This reading of the SOX antiretaliation provision is consistent with our

8    interpretation of nearly identical language in the Federal Railroad Safety Act, 49

9    U.S.C. § 20109(a) ("FRSA").  *See Tompkins v. Metro-N. Commuter R.R. Co.*, 983 F.3d

10   74 (2d Cir. 2020).[5]  We generally interpret identical language in different statutes

11   to have the same meaning.  *See, e.g.*, *Northcross v. Bd. of Educ.*, 412 U.S. 427, 428

12   (1973) ("The similarity of language in § 718 and § 204(b) is, of course, a strong

13   indication that the two statutes should be interpreted pari passu."); *Wasser v. N.Y.*

14   *State Off. of Vocational & Educ. Servs. for Individuals with Disabilities*, 602 F.3d 476,

15   479 (2d Cir. 2010) ("Given the similarity between, and in fact the nearly identical

16   wording of, 29 U.S.C. § 722(c)(5)(J)(ii) and 20 U.S.C. § 1415(i)(2)(C), we see no basis

17   for interpreting the standard of review required by these provisions differently.").

---

[5] We note that the district court did not have the benefit of our decision in *Tompkins* during the pendency of Murray's trial; *Tompkins* was decided one day after the district court entered final judgment in this case.

1    The relevant statutory language of the SOX and the FRSA is nearly identical.

2    *Compare* 18 U.S.C. § 1514A(a) (No covered employer "may discharge, demote,

3    suspend, threaten, harass, or in any other manner discriminate against an

4    employee in the terms and conditions of employment because of any lawful act

5    done by the employee . . . to provide information, cause information to be

6    provided, or otherwise assist in an investigation regarding any conduct which the

7    employee reasonably believes constitutes a violation of [federal law]."), *with* 49

8    U.S.C. § 20109(a) (A covered railroad carrier "may not discharge, demote,

9    suspend, reprimand, or in any other way discriminate against an employee if such

10   discrimination is due, in whole or in part, to the employee's lawful, good faith act

11   done, or perceived by the employer to have been done or about to be done . . . to

12   provide information, directly cause information to be provided, or otherwise

13   directly assist in any investigation regarding any conduct which the employee

14   reasonably believes constitutes a violation of any [federal law]."). Accordingly,

15   our articulations of the elements of these claims must likewise be consistent.[6]

---

[6] *Compare Bechtel*, 710 F.3d at 447 (To prevail on a SOX antiretaliation claim, "an employee must prove by a preponderance of the evidence that (1) [he] engaged in protected activity; (2) the employer knew that [he] engaged in the protected activity; (3) [he] suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." (citation omitted)), *with Tompkins*, 983 F.3d at 80 (To prevail on an FRSA antiretaliation

1    In *Tompkins*, we interpreted the whistleblower antiretaliation provision of

2    the FRSA and held that "some evidence of retaliatory intent is a necessary

3    component of an FRSA claim."  983 F.3d at 82; *see also Armstrong v. BNSF Ry. Co.*,

4    880 F.3d 377, 382 (7th Cir. 2018) ("The [FRSA] prohibits intentional discrimination

5    in response to an employee's performance of a protected activity.  That is to say,

6    an employer violates the statute only if the adverse employment action is, at some

7    level, *motivated* by discriminatory animus." (citation omitted) (emphasis in

8    original)).  We pointed to the language specifically referencing discrimination—

9    *i.e.*, "that a rail carrier may not discharge 'or in any other way *discriminate* against'

10   an employee for engaging in protected activity"—as requiring evidence of

11   retaliatory intent for an FRSA claim.  *Tompkins*, 983 F.3d at 82 (citations omitted)

12   (emphasis in original).  We also explained that "the essence of such a tort is

13   discriminatory animus, which in turn requires the employee to prove that she was

14   the victim of intentional retaliation prompted by her protected activity."  *Id*.

15   (cleaned up).

---

claim, "a plaintiff must show by a preponderance of the evidence that (1) the plaintiff engaged in
protected activity; (2) the employer knew that the plaintiff engaged in the protected activity;
(3) the plaintiff suffered an unfavorable personnel action; and (4) the protected activity was a
contributing factor in the unfavorable action." (cleaned up)).

1    The unambiguous, ordinary meaning of section 1514A's statutory language,

2    along with our identical interpretation of the FRSA antiretaliation provision, thus

3    compel the conclusion that a SOX antiretaliation claim requires a showing that the

4    employer took the adverse employment action against the whistleblower-

5    employee with retaliatory intent.[7]  As in *Tompkins*, the whistleblower-employee

6    need not show that retaliatory intent "was the sole factor affecting the discipline

7    or that the employer acted only with retaliatory motive."  983 F.3d at 82.  There

8    must, however, be "more than a temporal connection between the protected

9    conduct and the adverse employment action."  *Id*. (internal quotation marks

10   omitted); *see also Armstrong*, 880 F.3d at 382 ("[W]hile a FRSA plaintiff need not

11   show that retaliation was the *sole* motivating factor in the adverse decision, the

---

[7] We recognize that our conclusion departs from the approach of the Fifth and Ninth Circuits as to the elements of a section 1514A claim.  *See Halliburton, Inc. v. Admin. Rev. Bd.*, 771 F.3d 254, 263 (5th Cir. 2014) (holding that retaliatory intent is not an element of a section 1514A claim); *Coppinger-Martin v. Solis*, 627 F.3d 745, 750 (9th Cir. 2010) (same).  In our view, those courts overlooked the plain meaning of the text.  Moreover, we note that the Second, Seventh, and Eighth Circuits have interpreted the same language in the FRSA to require a showing of retaliatory intent.  *See Tompkins*, 983 F.3d at 82; *Armstrong*, 880 F.3d at 382; *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 791 (8th Cir. 2014).  *But see Frost v. BNSF Ry. Co.*, 914 F.3d 1189, 1196 (9th Cir. 2019) (holding that an FRSA antiretaliation claim does not require proof of retaliatory intent); *Araujo v. N.J. Transit Rail Operations, Inc.*, 708 F.3d 152, 158 (3d Cir. 2013) (same).  We also note that three circuits have declined to decide the issue of whether retaliatory intent is an element of a section 1514A claim.  *See Wiest v. Tyco Electronics Corp.*, 812 F.3d 319, 330 (3d Cir. 2016); *Feldman v. Law Enforcement Assoc's Corp.*, 752 F.3d 339, 348 (4th Cir. 2014); *Lockheed Martin Corp. v. Admin. Rev. Bd.*, 717 F.3d 1121, 1136 (10th Cir. 2013).

16

1    statutory text requires a showing that retaliation was *a* motivating factor.")

2    (emphasis in original)).[8]

3    C.    <u>The Jury Instruction Error Was Not Harmless</u>

4            We must next determine the appropriate remedy for the district court's jury-

5    instruction error.  "We review a claim of error in jury instructions *de novo*,

6    reversing only where appellant can show that, viewing the charge as a whole,

7    there was a prejudicial error."  *Warren v. Pataki*, 823 F.3d 125, 137 (2d Cir. 2016)

8    (cleaned up).  "An erroneous instruction requires a new trial unless the error is

9    harmless and an error is harmless only if the court is convinced that the error did

10   not influence the jury's verdict."  *Id*. (cleaned up).

11           Because we need to be convinced that the error did not influence the jury's

12   verdict, the district court's failure to instruct the jury on Murray's burden to prove

13   UBS's retaliatory intent in terminating him was not harmless.  Indeed, the district

14   court itself remarked that this was "one of the closest [cases] [it] has ever

---

[8] This framework is consistent with the goal of section 1514A to "combat what Congress identified as a corporate culture, supported by law, that discourages employees from reporting fraudulent behavior . . . [by] protect[ing] employees when they take lawful acts to disclose information or otherwise assist . . . in detecting and stopping actions which they reasonably believe to be fraudulent."  *Bechtel*, 710 F.3d at 446 (cleaned up); *see also Guyden v. Aetna, Inc.*, 544 F.3d 376, 383 (2d Cir. 2008) (Section 1514A "protects 'employees when they take lawful acts to disclose information or otherwise assist . . . in detecting and stopping actions which they reasonably believe to be fraudulent.'") (quoting S. Rep. No. 107–146, at 19)).

1    observed."  Sp. App'x at 55.  UBS offered evidence at trial of non-retaliatory

2    reasons for its decision to terminate Murray.  For example, UBS witnesses testified

3    that the company was experiencing significant financial difficulties, resulting in

4    company-wide layoffs when Murray reported the alleged misconduct and was

5    ultimately terminated.  In response to a question about why UBS imposed layoffs,

6    a UBS witness testified: "[In] 2011 our financial performance or the performance

7    of the firm was not good.  We lost billions of dollars that year and, therefore, we

8    had to layoff people."  App'x at 573; *see id*. at 575 (citing "a two billion dollar

9    trading loss" as a cause of "more financial hardship to [UBS]").  Cohen, the head

10   of the CMBS trading desk, also testified that Murray's position as a CMBS

11   strategist was "not necessary" to generate revenue, but instead was "nice to have."

12   *Id*. at 867.  This evidence supports UBS's position that it terminated Murray

13   without retaliatory intent—specifically, that it did so for the non-retaliatory reason

14   of saving money during a time of financial difficulty.  To be sure, there was

15   circumstantial evidence at trial that UBS terminated Murray in retaliation for

16   whistleblowing.  *See, e.g.*, App'x at 649 (testimony explaining close temporal

17   proximity between Murray's whistleblowing and termination); *id*. at 447

18   (testimony of Schumacher stating that he gave Murray a "good" performance

18

1    evaluation in December 2011, prior to Murray's purported whistleblowing).  But

2    we do not know whose reasons—UBS's or Murray's—the jury credited, as the jury

3    instructions did not require the jury to find retaliatory intent.  And although the

4    jury did not find that UBS "prove[d] by clear and convincing evidence that it

5    would have taken the same unfavorable personnel action in the absence of

6    [Murray's] protected behavior," *Bechtel*, 710 F.3d at 447 (citation omitted), this does

7    not mean that Murray proved by a preponderance of the evidence that UBS acted

8    with retaliatory intent in terminating Murray.  In other words, even though the

9    jury found that Murray's whistleblowing was a contributing factor to his

10   termination, we cannot know whether it would have found that UBS acted with

11   retaliatory intent.  We are thus unconvinced that the erroneous jury instruction

12   did not influence the verdict, and we accordingly remand to the district court for

13   a new trial.

14                              **III.  CONCLUSION**

15        Retaliatory intent is an element of a section 1514A claim.  This conclusion

16   flows from the plain meaning of the statutory language and is supported by our

17   interpretation of nearly identical language in the FRSA.  The district court erred

18   by failing to instruct the jury on Murray's burden to prove UBS's retaliatory intent

                                    19

1    in terminating him.  The jury instructions were incorrect as a matter of law, and

2    the error was not harmless.  We thus vacate the jury's verdict and remand to the

3    district court for a new trial.